**UNITED STATES of America, Plaintiff,**

v.

**Jose Manuel CABRERA, Defendant.**

**Criminal No. B–04–445–1.**

United States District Court, S.D. Texas, Brownsville Division.

May 4, 2010.

William F. Hagen, United States Attorney's Office, Brownsville, TX, for Plaintiff.

---

Oscar de la Fuente, Jr., Attorney at Law, Harlingen, TX, for Defendant.

### ORDER

ANDREW S. HANEN, District Judge.

On January 23, 2010, this Court held a hearing on the defendant's Motion to Dismiss due to the alleged denial of his right to a speedy trial. Prior to this Court issuing a formal opinion on this motion, the defendant decided to change his plea from one of "not guilty" to "guilty." The Court accepted the defendant's guilty plea, found the defendant guilty of trafficking in illegal controlled substances and sentenced the defendant.

Since the defendant has pleaded guilty pursuant to a plea agreement in which he waived appeal and the outcome of the case is no longer a pending question, this Court now feels compelled to address an issue which arose during the January 23, 2010 hearing. It became apparent based upon the testimony of the defendant as well as various government witnesses connected with the Department of Homeland Security that the United States Citizenship and Immigration Services has embarked on a relatively new (in effect since February 6, 2009) and potentially dangerous course of action.[1]

Starting in February of 2009, according to the Revised Guidance Pertaining to the Adjudication of Form I–90, *Application to Replace Permanent Resident Card* ("The Policy"), employees of the Citizenship and Immigration Services are being instructed to issue replacement Legal Permanent Resident Cards even to those LPRs who are wanted by law enforcement officers for serious crimes.[2] Employees are apparently instructed that in issuing those replacement cards they are not to timely contact law enforcement officers to inform them of the location of these wanted individuals.[3]

Even more alarming to this Court, applicants categorized as "egregious public safety" cases (including, for example, cases of murder, rape, sexual abuse of a minor, illicit trafficking in firearms or destructive devices, offenses relating to explosive materials or firearms, offenses related to the demand for or receipt of ransom, offenses related to child pornography, offenses related to alien smuggling, and human rights violations) are covered by this "no tell" policy. *See* The Policy, at 2 (explicitly stating that "egregious public safety" cases will not be referred to ICE until *after* adjudication of the I–90); United States Citizenship & Immigration Services, Policy Memorandum No. 110, at 2 *available at*, http://www.asistahelp.org/VAWA/ Aytes207–11–0620NTAs.pdf (listing offenses that fall into the category of "egre-

---

**1.** This testimony by the government's witnesses concerning this "new policy" was confirmed by the attorneys for the United States.

**2.** United States Citizenship & Immigration Services, Interoffice Memorandum, Revised Guidance Pertaining to the Adjudication of Form I–90, *Application to Replace Permanent Resident Card, available at* http://www. eichorn-law.com/CM/IntheNews/2.6.2009 %20Neufield MemoönÏ–90Ädjudications.pdf.

**3.** This Court notes, in actuality, that the policy as expressed in the memorandum provided to the Court states that "... any derogatory in-

formation received as a result of [fingerprint and Interagency Border Inspection System] checks will be resolved *only after* the adjudication of the I–90 application." In practice, this apparently means that the service does nothing and gives individuals wanted for crimes (some, like the defendant in this case, serious crimes) the papers necessary for them to avoid prosecution and travel freely and then sends them on their way to perpetrate more crimes on the residents of the United States. Thereafter, if at all, it notifies law enforcement.

gious public safety" cases).[4] Accordingly, applicants for a replacement Permanent Resident Alien card who fall into one of these categories will have their applications adjudicated and a new card issued before ICE is informed of their criminal history and whereabouts. This policy is short sighted, dangerous and is not required by the Constitution or laws of this country.[5] In this case, it enabled a known drug trafficker to avoid arrest and remain free. He was only captured by a chance encounter with law enforcement officers in Colorado.

It might be debatable, among those who argue immigration policy, whether one, who is a wanted fugitive and is being pursued by law enforcement, has an unfettered right to get the evidence of his or her "legal" resident status. Regardless, there is no good or valid purpose for a policy (i.e., to provide proof of status to the applicant) that requires that such proof be provided to the wanted applicant *before* ICE officers (or other law enforcement officers) are informed. This policy, in effect, is giving such wanted individuals an undeserved "head start" so that they can avoid law enforcement. This is exactly what occurred in this case. As long as there is no delay in processing such I–90, there is no reason that the individuals processing the applications cannot tell law enforcement officials of the application of a wanted individual and his or her location either before or simultaneous with the processing of the I–90.

If a private individual were to give a person who may be evading capture by law enforcement the means to help them escape, they might very well be prosecuted. This policy does the same thing. The Citizenship and Immigration Service under this policy might well qualify under some laws as accessories after the fact. The defendant in this case lost his Permanent Resident Card fleeing from law enforcement. He then used a false address and misrepresented his status to gain his replacement Permanent Resident Card. These falsehoods, in and of themselves, should have negated his I–90 application and this would have been known to immigration officials but for this policy. Even a greater concern is the fact that this policy allowed a known drug trafficker to remain at large and evade arrest. It will only be a matter of time before something far worse happens. One can easily envision an individual wanted for murder, illegal firearm trafficking, alien smuggling, or even multiple episodes of driving under the influence getting his replacement identification that enables him to remain at large, evading law enforcement. Later that individual may commit another serious crime in which an innocent victim is hurt or killed. It has occurred all too frequently, so it does not even take imagination to foresee a scenario in which such an individual could commit a serious offense and kill someone.

4. The Court recognizes that the attorneys for the government stated that an exemption existed for certain serious crimes, but a review of the policy reveals that this is not the case. While certain serious crimes such as murder and rape are covered in a separate paragraph of the policy, it still tells immigration officials to refer these cases to ICE "only after the adjudication of the I–90 application has been completed." The Policy, at 2 ("I–90 applications with an associated national security or egregious public safety concern will also be adjudicated pursuant to the above-mentioned instructions *before* a referral it ICE is made" (emphasis added)).

5. It was represented to this Court in response to its inquiry that this policy was instituted in reaction to a lawsuit or court order, yet no one cited this court to any causative lawsuit, order or opinion, and this Court has been unable to find one.

This is a bad and dangerous policy. It purposefully hinders law enforcement officers from doing their job. It intentionally erases, or at least hides the dots, so that law enforcement officials cannot connect them in a timely fashion and it should be amended or abandoned before it causes the United States or an innocent bystander to suffer dire consequences.